AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

12/18/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

12/18/20

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jm _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

MUHAMMAD NOOR UL AIN ATTA,
aka "Muhammad Atta,"

Defendant.

Case No.   2:20-mj-06152 -DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning in or around April 2020 and continuing until at least in or around July 2020, in the counties of Los Angeles and Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Count 1:  18 U.S.C. § 1343 | Wire Fraud |
| Count 2:  18 U.S.C. § 1028A(a)(1) | Aggravated Identity Theft |
| Count 3:  18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

Attested to by applicant in accordance with the requirements
of Fed. R. Crim. P. 4.1 by telephone
*Complainant's signature*

Cecilia Braga, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   December 18, 2020

*Judge's signature*

City and state:   Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, Cecilia Braga, being duly sworn, declare and state as follows:

## **INTRODUCTION**

1.    I am a Senior Special Agent with the Office of Inspector General of the Board of Governors of the Federal Reserve System and Consumer Financial Protection Bureau ("FRB-CFPB OIG") and have been so employed since January 28, 2013. Prior to being employed with the FRB-CFPB OIG, I was a Special Agent with the Internal Revenue Service – Criminal Investigation ("IRS-CI") for 17 years.  I am currently assigned to the FRB-CFPB OIG's San Francisco Field Office, which is responsible for investigating complex financial crimes to combat waste, fraud, and abuse relating to the programs and operations of the FRB and CFPB in the western region.  During my tenure with the FRB-CFPB OIG and IRS-CI, I have received training in the investigation of financial crimes and in financial analysis.  As part of my duties as a Special Agent, I have participated in investigations relating to wire fraud, bank fraud, money laundering, and various types of complex financial crimes.  During my career, I have been the affiant on applications for search warrants and arrest warrants in federal criminal investigations.

## PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a criminal complaint against, and arrest warrant for, MUHAMMAD NOOR UL AIN ATTA (also known as "Muhammad Atta," and hereinafter, "ATTA") for violation of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1028A(a)(1) (Aggravated Identity Theft), and 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering).

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## SUMMARY OF PROBABLE CAUSE

4.   Beginning in or around April 2020 and continuing until at least in or around July 2020, ATTA, together with other co-schemers including Co-Schemer 1 ("CS-1"), submitted and caused to be submitted in the names of certain entities at least seven fraudulent Paycheck Protection Program ("PPP") loan applications and at least four fraudulent Economic Injury Disaster Loan Program ("EIDL") applications.  Among other

things, these applications misrepresented the number of
employees and payroll data associated with the respective
companies and in most cases submitted fraudulent IRS Forms 941
as support, which representations were material to the approval
and amount of the PPP and EIDL loans.  While all of the
applications connect either directly to ATTA or indirectly
through emails and IP addresses associated with him, ATTA and
his co-schemers also submitted a number of these loan
applications using the personal identifying information of M.P.,
an individual with no known involvement in the scheme.  M.P.,
who was incarcerated at the time of the applications, never
provided ATTA with permission to use M.P.'s name and identity.
As a result of these fraudulent loan applications, ATTA and his
co-schemers received a total of approximately $6 million in PPP
proceeds from Lender A and approximately $600,000 in EIDL
proceeds from the Small Business Administration ("SBA").

    5.   The applications were approved and the PPP and EIDL
loans were subsequently funded as described below:

| Entity Name | Approximate Date Funded | Lender | Loan Type | Approximate Loan Amount |
|---|---|---|---|---|
| Fontana CK | June 5, 2020 | Lender A | PPP | $1,908,595 |
| Liberty RV LLC | May 12, 2020 | Lender A | PPP | $260,275 |
| Liberty RV LLC | July 2, 2020 | SBA | EIDL | $150,000 |
| American Auto Barn | May 12, 2020 | Lender A | PPP | $401,175 |
| American Auto Barn | June 12, 2020 | SBA | EIDL | $150,000 |
| Envisioning Future Inc. | May 12, 2020 | Lender A | PPP | $1,267,140 |
| Envisioning Future Inc. | June 12, 2020 | SBA | EIDL | $150,000 |
| Wermer Construction Inc. | May 13, 2020 | Lender A | PPP | $326,335 |
| Wermer Construction Inc. | July 2, 2020 | SBA | EIDL | $150,000 |

| Entity Name | Approximate Date Funded | Lender | Loan Type | Approximate Loan Amount |
|---|---|---|---|---|
| CKSB LLC | June 3, 2020 | Lender A | PPP | $1,020,230 |
| Camel and Camel | June 3, 2020 | Lender A | PPP | $859,790 |
| | | | Total: | $6,643,540 |

6.    ATTA, together with CS-1 and other co-schemers, then directed the fraudulently obtained loan proceeds to accounts that they owned and/or controlled before ultimately wiring approximately $6 million to Pakistan for "family support."  In other words, ATTA, together with CS-1 and other co-schemers, improperly used those funds for their own personal benefit rather than for the business expenses for which the loan applications certified they would be used.

<u>**STATEMENT OF PROBABLE CAUSE**</u>

7.    Based on witness interviews I have conducted, my review of documents obtained from third parties, reports of interviews conducted by me and other law enforcement officers, conversations with other law enforcement officers, and publicly filed documents, I know the following:

<u>**The Small Business Administration**</u>

a.    The United States SBA was an agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment

and viability of small businesses and by assisting in the economic recovery of communities after disasters.

### The Paycheck Protection Program

b.   The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  One form of assistance provided by the CARES Act was the authorization of United States taxpayer funds in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program or "PPP."

c.   In order to obtain a PPP loan, a qualifying business would be required to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments."  The application (through its authorized representative) was also

required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges."  In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

d.   A business's PPP loan application would be received and processed, in the first instance, by a participating financial institution.  If a PPP loan application was approved, the participating financial institution would fund the PPP loan using its own monies.

e.   PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used at least a minimum amount of the PPP loan proceeds on payroll expenses.

## The Economic Injury Disaster Loan Program

f.   The Economic Injury Disaster Loan Program ("EIDL") was a SBA program that provided low-interest financing

to small businesses, renters, and homeowners in regions affected
by declared disasters.

g.   The CARES Act authorized the SBA to provide EIDL
loans of up to $2 million to eligible small businesses
experiencing substantial financial disruption due to the COVID-
19 pandemic.

h.   To obtain an EIDL loan, a qualifying business was
required to submit an application to the SBA and provide
information about the business's operations, such as the number
of employees, gross revenues for the 12-month period preceding
the disaster, and cost of goods sold in the 12-month period
preceding the disaster.  In the case of EIDL loans for COVID-19
relief, the 12-month period was the 12-month period from
January 31, 2019, to January 31, 2020.  The applicant was also
required to certify that all of the information in the
application was true and correct to the best of the applicant's
knowledge.

i.   EIDL loan applications were submitted directly to
the SBA and processed by the agency with support from a
government contractor.  The amount of the loan, if the
application was approved, was determined based, in part, on the
information provided by the applicant about employment, revenue,
and cost of goods sold, as described in paragraph 7(c) above.

Any funds issued under an EIDL loan were issued directly by the SBA.

　　　　j.　EIDL loan funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL loan funds could not be used for the same purpose as the PPP loan funds.

### Relevant Individuals and Entities

　　8.　Based on my review of identity documents, information obtained from an investigative database, and open source research, I know the following:

　　　　a.　ATTA is a naturalized United States citizen from Pakistan and a resident of Eastvale, California, within the Central District of California.

　　　　b.　Co-Schemer 1 ("CS-1"), a lawful permanent United States resident and a resident of La Verne, California, within the Central District of California, is ATTA's mother.

　　　　c.　Individual 1 is a resident of La Verne, California, within the Central District of California, and is ATTA's father-in-law.

　　　　d.　M.P., who is a real person, has been incarcerated in Illinois since approximately 2008 for a felony offense, and has no known relationship to ATTA.

    e.    Lender A is a non-bank lender that was an approved SBA lender of PPP loans.

    f.    Financial Institutions 1, 2, 3, 4, and 5 are financial institutions that are insured by the Federal Deposit Insurance Corporation.

    g.    Financial Institution 6 is an Islamic bank located in Pakistan and is a wholly-owned subsidiary of an Islamic bank headquartered in Dubai, United Arab Emirates.

9.    According to charter documents, statements of information, and other records received from the California Secretary of State, I know the following:

    a.    Fontana CK Inc. was incorporated in January 2015 by ATTA.  ATTA is listed as the incorporator, CEO, CFO, President, Secretary, sole director, and agent for service of process for the entity.

    b.    Liberty RV, LLC was created in October 2008. None of the entity's charter documents or subsequent filings reference ATTA.

    c.    American Auto Barn LLC was created in April 2018. Its Statement of Information filed in May 2018 lists ATTA as its sole manager/member.

    d.    Envisioning Future Inc. was incorporated in or around April 2008 by ATTA.  ATTA is listed as the incorporator,

CEO, CFO, President, Secretary, sole director, and agent for service of process for the entity.

   e.   Wermer Construction Inc. was incorporated in September 2014 by ATTA.  ATTA is listed as the incorporator, CEO, CFO, President, Secretary, sole director, and agent for service of process for the entity.

   f.   CKSB, LLC was created in November 2016.  None of the entity's charter documents or subsequent filings reference ATTA.

   g.   Camel and Camel Inc. was incorporated in November 2010 and ATTA was listed as the initial agent for service of process in the original articles of incorporation.  In subsequent filings, ATTA is also listed as the CEO, CFO, President, Secretary, and sole director for the entity.

**Relevant Accounts Controlled by ATTA & Others**

10.  According to records from Financial Institution 1, ATTA controlled and was the sole signatory to the following accounts at Financial Institution 1:

   a.   A business checking account in the name of Fontana CK Inc. ending in 6052 (the "Fontana CK Account");

   b.   A business checking account in the name of Envisioning Future Inc. ending in 0859 (the "Envisioning Future Account");

   c. A business checking account in the name of American Auto Barn LLC ending in 2143 (the "American Auto Barn Account");

   d. A business checking account in the name of Wermer Construction Inc. ending in 0251 (the "Wermer Construction Account");

   e. A business checking account in the name of CKSB LLC ending in 1858 (the "CKSB Account"); and

   f. A business checking account in the name of Camel and Camel Inc. ending in 3333 (the "Camel and Camel Account").

  11. According to records from Financial Institution 1, CS-1 controlled and was a signatory to the following accounts at Financial Institution 1:

   a. A personal checking account in the name of CS-1 ending in 3283 ("CS-1 Account #1"); and

   b. A personal checking account in the name of CS-1 ending in 7764 ("CS-1 Account #2").

  12. According to records from Financial Institution 2, CS-1 controlled and was a signatory to a personal checking account in the name of CS-1 ending in 5659 ("CS-1 Account #3").

  13. According to records from Financial Institution 3, CS-1 controlled and was a signatory to a personal checking account in the name of CS-1 ending in 4092 ("CS-1 Account #4").

14. According to records from Financial Institution 4, CS-1 controlled and was a signatory to a personal checking account in the name of CS-1 ending in 5306 ("CS-1 Account #5").

15. According to records from Financial Institution 5, CS-1 controlled and was a signatory to a personal checking account in the name of CS-1 ending in 7346 ("CS-1 Account #6").

16. According to records from Financial Institution 1, Individual 1 controlled and was a signatory to a business checking account in the name of Liberty RV LLC ending in 7526 ("Liberty RV Account").

**Fontana CK PPP Loan**

17. Based on my review of loan documents provided by Lender A, I learned the following:

a. On or about June 1, 2020, Lender A received a PPP application in the name of Fontana CK Inc. ("Fontana CK") seeking a PPP loan in the amount of $1,908,595.

b. The application was electronically submitted through IP address 64.44.55.84 in the name of M.P., who was listed on the loan application as the President and 100% owner of Fontana CK.[1]

---

[1] However, based on my review of documents from the California Secretary of State, I know that ATTA is listed as Fontana CK's President.

      c.   The PPP borrower application represented that Fontana CK had 174 employees, including employees for whom it paid wages and payroll taxes, and that the purpose of the PPP loan was to cover payroll, lease/mortgage interest, and utilities.

      d.   The email associated with this PPP loan application was fontanack2015@gmail.com.

18.   According to records supplied by Google LLC ("Google"), I know the following:

      a.   The email address fontanack2015@gmail.com is connected to ATTA through the listed "Recovery SMS number" of 19097499426[2] and a "Recovery e-mail" of attamuh@gmail.com.

      b.   The subscriber information associated with attamuh@gmail.com shows that this email is registered to "Muhammad Noor Atta."  Further, the recovery email associated with the attamuh@gmail.com is noorlawschool@gmail.com while the recovery SMS number is 9097499426 (i.e., the same recovery SMS number associated with the fontanack2015@gmail.com).

---

[2] Based on a reverse phone lookup search of the phone number, (909) 749-9426, through Google, I determined that most recent owner for this number was "Mohammed LNU" with an address of "******Blazing Star Drive, Corona, CA 92880."  Based my search of an investigative database, I know that ATTA owns and resides at 14794 Blazing Star Drive, Eastvale, CA 92880.

c.    The IP address 64.44.55.84, which was used for submission of the Fontana CK PPP loan application, was also used to access both fontanack2015@gmail.com and attamuh@gmail.com.

d.    The IP address 104.34.50.159 was also used to access both fontanack2015@gmail.com and attamuh@gmail.com.

19.    Based on my review of loan documents provided by Lender A, several documents were submitted in support of the Fontana CK PPP loan application, including:

a.    Internal Revenue Service ("IRS") Employer's Quarterly Federal Tax Returns (IRS Form 941) for Fontana CK for each quarter of 2019 and the first quarter of 2020;

b.    Payroll data and documentation for Fontana CK, including documents purporting to be payroll registers for 2019 and the first quarter of 2020, purporting to show wages paid to its employees; and

c.    An Illinois state driver's license purportedly issued to M.P. in February 2019, well after M.P. had been incarcerated as discussed below in paragraph 21.

20.    Based on information from the IRS, I know that the IRS Forms 941 submitted with the Fontana CK PPP loan were not filed with the IRS.  In fact, IRS records show that Fontana CK had not filed quarterly federal income tax returns with the IRS for 2019 and the first quarter of 2020.  In addition, IRS records show

that Fontana CK's Employer Identification Number ("EIN") is registered to ATTA.

21.  Based on an interview with M.P. and records from the Illinois Department of Corrections ("IDOC"), I have learned the following:

  a.  M.P. was incarcerated with IDOC when the Fontana CK PPP loan application was submitted in his name.

  b.  IDOC records show that M.P. has been incarcerated with IDOC since approximately 2012 after his/her conviction at trial and that M.P. was held in pretrial detention in county jail starting in 2008, while awaiting trial.

  c.  During the interview, M.P. confirmed that while the social security number from the Fontana CK PPP application was his/hers, s/he did not submit the Fontana CK PPP application, s/he had never heard of ATTA, CS-1, or Fontana CK prior to the interview, and said the signature on the Fontana CK PPP application was not his/hers.  During his/her interview, M.P. further stated that s/he never had an Illinois driver's license, s/he did not recognize the photo on the license, the signature on the license was not his/hers, and s/he did not recognize the address listed on the license.

22.  Based on a review of a copy of M.P.'s purported driver's license submitted in connection with the Fontana CK PPP loan application, I know that it says it was issued on or about

February 6, 2019.  Based on a review of IDOC records, I know that M.P. was incarcerated in the custody of IDOC at that time.

23.  Based on a review of the payroll data and documentation for Fontana CK provided to Lender A, I know that the number of employees listed in that data and documentation did not match the number listed in the IRS Forms 941 that were submitted to Lender A.  Further, there were employees listed in the payroll data multiple times making it appear that these employees were paid multiple times within the same pay period.

24.  Based on surveillance conducted during business hours on or about July 22, 2020, by another agent assisting with this investigation, at that time, Fontana CK appeared to be an active business (specifically, a Circle K convenience store).  Only two employees were observed on the premises.  Even assuming that the store employed other individuals to cover additional shifts, based on my training and experience, a business like this would not be expected to employ anything close to 174 employees, as the application represented.

25.  Based on my review of loan documents provided by Lender A, I know that it approved Fontana CK's PPP application and funded the loan.  According to records provided by Lender A and Financial Institution 1, on or about June 5, 2020, Lender A transferred via interstate wire approximately $1,908,595 in proceeds from the Fontana CK PPP loan to the Fontana CK Account,

for which ATTA was the sole signatory.  At the time the PPP loan proceeds were transferred, the Fontana CK Account had $100 on deposit.

26.  According to records provided by Financial Institution 1, just three days later, on or about June 8, 2020, a cashier's check for approximately $1,908,000 -- comprised mostly, if not entirely, of the Fontana CK PPP loan proceeds -- was purchased from funds drawn on the Fontana CK Account. According to records provided by Financial Institution 4, on or about June 8, 2020, the cashier's check was deposited into CS-1 Account #4.

### Liberty RV PPP Loan

27.  Based on my review of loan documents provided by Lender A, I learned the following:

a.  On or about April 14, 2020, Lender A received a PPP application in the name of Liberty RV seeking a PPP loan in the amount of $260,291.

b.  The application was electronically submitted in the name of M.P., who was listed on tfhe loan application as the Managing Member and 100% owner of Liberty RV.[3]

_____

[3] Based on my review of records from the California Secretary of State, I know that M.P. is not listed as the Managing Member or owner of this entity.  In fact, the records do not reference M.P. in any way.

c.    The PPP borrower application represented that Liberty RV had 37 employees, including employees for whom it paid wages and payroll taxes.

d.    The email associated with this PPP loan application was libertyrv2009@gmail.com.

28.    According to records supplied by Google, I know the following:

a.    The email address libertyrv2009@gmail.com has a "Recovery e-mail" of eficpa009@gmail.com, which is associated with the loan application for CKSB, LLC discussed below in paragraph 69.

b.    The IP address 104.34.50.159, the same IP address used to access ATTA's personal Gmail addresses as discussed above in paragraph 18, was also used to access libertyrv2009@gmail.com and eficpa009@gmail.com.

29.    Based on my review of loan documents provided by Lender A, several documents were submitted in support of the Liberty RV PPP loan application, including:

a.    IRS Employer's Quarterly Federal Tax Returns (IRS Form 941) for Liberty RV for each quarter of 2019 and the first quarter of 2020;

b.    Payroll data and documentation for Liberty RV, including documents purporting to be payroll registers for 2019

and the first quarter of 2020, purporting to show wages paid to its employees; and

c.    A copy of the same fraudulent Illinois state driver's license purportedly issued to M.P. in 2019, described above in paragraph 22.

30.  Based on information from the IRS, I know that the IRS Forms 941 submitted with the Liberty RV PPP loan were not filed with the IRS.  In fact, IRS records show that Liberty RV had not filed quarterly federal income tax returns with the IRS for 2019 and the first quarter of 2020.

31.  As described above in paragraph 21, M.P. was incarcerated at the time the Liberty RV PPP loan application was submitted in his/her name.  In his/her interview, M.P. stated that s/he did not submit the Liberty RV PPP application, s/he had never heard of Liberty RV prior to the interview, and said the signature on the Liberty RV PPP application was not his/hers.

32.  Based on a review of the payroll data and documentation for Liberty RV provided to Lender A, I know that the number of employees listed in that data and documentation did not match the number listed in the IRS Forms 941 that were submitted to Lender A.  In addition, based on surveillance of the address listed in the PPP application for Liberty RV, there

was no indicia, signage, or other identifiable business markings
for the Liberty RV business at the location.

33.  Based on my review of loan documents provided by
Lender A, I know that it approved Liberty RV's PPP application
and funded the loan.  According to records provided by Lender A
and Financial Institution 1, on or about May 12, 2020, Lender A
transferred via interstate wire approximately $260,275 in
proceeds from the Liberty RV PPP loan to the Liberty RV Account.
At the time the PPP loan proceeds were transferred, the Liberty
RV Account had approximately $100 on deposit.

34.  According to records provided by Financial
Institution 1, the following day, on or about May 13, 2020,
approximately $260,000, which in substantial part was comprised
of the Liberty RV PPP loan proceeds, was wired from the Liberty
RV Account to the American Auto Barn Account, for which ATTA was
the sole signatory.

### Liberty RV EIDL Loan

35.  Based on my review of information provided by the SBA,
the SBA received an application in the name of Liberty RV
seeking an EIDL loan in the amount of $150,000.  The application
was electronically submitted in the name of M.P. via the SBA's
online portal.

36.  The EIDL application for Liberty RV represented that
it had 37 employees.  As described above in paragraphs 29 to 34,

evidence gathered in the government's investigation revealed that this statement is false and the use of M.P.'s name and identity in connection with Liberty RV was fraudulent.

37.   The SBA approved and funded the Liberty RV EIDL loan, and on or about July 2, 2020, the SBA transferred via interstate wire approximately $149,900 in proceeds from the Liberty RV EIDL loan to the Liberty RV Account.  At the time the EIDL loan proceeds were transferred, the Liberty RV Account had approximately $275 on deposit.

38.   According to records provided by Financial Institution 1, the following day, on or about July 3, 2020, approximately $149,500, which in substantial part was comprised of the Liberty RV EIDL loan proceeds, was wired from the Liberty RV Account to the American Auto Barn Account, for which ATTA is the sole signatory.

### American Auto Barn PPP Loan

39.   Based on my review of loan documents provided by Lender A, I know the following:

a.   On or about April 14, 2020, Lender A received a PPP application in the name of American Auto Barn LLC ("American Auto Barn") seeking a PPP loan in the amount of $401,185.

b.   The application was electronically submitted in the name of ATTA, who described himself as the Manager and 100% owner of American Auto Barn.

c.    The PPP borrower application represented that American Auto Barn had 45 employees, including employees for whom it paid wages and payroll taxes, and that the purpose of the PPP loan was to cover payroll.

d.    The email associated with this PPP loan application was americanautobarn@gmail.com.

40.   According to records supplied by Google, I know the following:

a.    The email address americanautobarn@gmail.com is connected to ATTA through the listed "Recovery SMS number" of 19097499426 and "Recovery e-mail" of noorlawschool@gmail.com, which are the same recovery SMS number and recovery email that ATTA listed for his personal Gmail account:  attamuh@gmail.com.

b.    The IP address, 104.34.50.159, was used to access americanautobarn@gmail.com and ATTA's personal Gmail account attamuh@gmail.com in addition to various other entity accounts tied to false and fraudulent loan applications discussed herein, including eficpa009@gmail.com, libertyrv2009@gmail.com, fontanack2015@gmail.com, and wermerconstruction@gmail.com.

41.   Based on my review of loan documents provided by Lender A, several documents were submitted in support of the American Auto Barn PPP loan application, including:

a.   IRS Employer's Quarterly Federal Tax Returns (IRS Form 941) for American Auto Barn for each quarter of 2019 and the first quarter of 2020; and

b.   Payroll data and documentation for American Auto Barn, including documents purporting to be payroll registers for 2019 and the first quarter of 2020, purporting to show wages paid to its employees.

42.  Based on information from the IRS, I know that the IRS Forms 941 submitted with the American Auto Barn PPP loan were not filed with the IRS.  In fact, IRS records show that American Auto Barn had not filed quarterly federal income tax returns with the IRS for 2019 and the first quarter of 2020.

43.  Based on my review of the American Auto Barn PPP loan application, I know that ATTA answered, "No" to the question:

> Has the Applicant, any owner of the Applicant, or any business owned or controlled by any of them, ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted in the last 7 years and caused a loss to the government?

Based on my review of SBA records, I know that ATTA is listed as a principal on a SBA loan for Moval Shopping Center LLC that was funded on January 5, 2016 and which, according to SBA records, has been delinquent since at least the beginning of 2019.

44.  Based on my review of loan documents provided by Lender A, I know that it approved American Auto Barn's PPP

application and funded the loan.  According to records provided
by Lender A and Financial Institution 1, on or about May 12,
2020, Lender A transferred via interstate wire approximately
$401,175 in proceeds from the American Auto Barn PPP loan to the
American Auto Barn Account, for which ATTA was the sole
signatory.  At the time the PPP loan proceeds were transferred,
the American Auto Barn Account had approximately $15,341 on
deposit.

45.  According to records provided by Financial
Institution 1, six days later on or about May 18, 2020, a
cashier's check for approximately $665,000, which in substantial
part was comprised of the American Auto Barn PPP loan proceeds
and the Liberty RV PPP loan proceeds (discussed above in
paragraph 33), was purchased from funds drawn on the American
Auto Barn Account.  According to records provided by Financial
Institution 4, on or about May 18, 2020, the cashier's check was
deposited into the CS-1 Account #5.

### American Auto Barn EIDL Loan

46.  Based on my review of information provided by the SBA,
the SBA received an application in the name of American Auto
Barn seeking an EIDL loan in the amount of $150,000.  The
application was electronically submitted in the name of ATTA via
the SBA's online portal.

47.   The SBA approved and funded the American Auto Barn EIDL loan, and on or about June 12, 2020, the SBA transferred via interstate wire approximately $149,900 in proceeds from the American Auto Barn EIDL loan to the American Auto Barn Account, for which ATTA is the sole signatory.   At the time the EIDL loan proceeds were transferred, the American Auto Barn Account had approximately $177,415 on deposit.   According to records provided by Financial Institution 1, on or about July 2, 2020, approximately $410,000, which in part was comprised of the American Auto Barn EIDL loan proceeds, was wired from the American Auto Barn Account to the CS-1 Account #2.   Based on my review of records from Financial Institution 1, the American Auto Barn EIDL loan proceeds were not used for expenses permitted under the EIDL loan program as described above in paragraphs 7(f)-7(j).

**Envisioning Future PPP Loan**

48.   Based on my review of loan documents provided by Lender A, I know the following:

a.   On or about April 10, 2020, Lender A received a PPP application in the name of Envisioning Future Inc. d/b/a Valero Gas Station ("Envisioning Future") seeking a PPP loan in the amount of $1,267,141.

b.   The application was electronically submitted in the name of ATTA, who described himself as the President and 100% owner of Envisioning Future.

c.   The PPP borrower application represented that Envisioning Future had 73 employees, including employees for whom it paid wages and payroll taxes, and that the purpose of the PPP loan was to cover payroll.

d.   The email associated with this PPP loan application was attamuh@gmail.com, ATTA's personal Gmail account.

e.   The loan application was electronically submitted to Lender A from the common IP address associated with other entity email addresses appearing in this investigation and ATTA's personal Gmail account, as discussed above: 104.34.50.159.

49.   Based on my review of loan documents provided by Lender A, several documents were submitted in support of the Envisioning Future PPP loan application, including:

a.   IRS Employer's Quarterly Federal Tax Returns (IRS Form 941) for Envisioning Future for each quarter of 2019 and the first quarter of 2020; and

b.   Payroll data and documentation for Envisioning Future, including documents purporting to be payroll registers

for 2019 and the first quarter of 2020, purporting to show wages paid to its employees.

50.   Based on information from the IRS, I know that the IRS Forms 941 submitted with the Envisioning Future PPP loan were not filed with the IRS.  In fact, IRS records show that Envisioning Future had not filed quarterly federal income tax returns with the IRS for 2019 and the first quarter of 2020.

51.   Based on my review of the Envisioning Future PPP loan application, I know that ATTA answered, "No" to the question:

> Has the Applicant, any owner of the Applicant, or any business owned or controlled by any of them, ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted in the last 7 years and caused a loss to the government?

Based on my review of SBA records and as discussed above, I know that ATTA is listed as a principal on a SBA loan for Moval Shopping Center LLC that was funded on January 5, 2016, and which, according to SBA records, has been delinquent since at least the beginning of 2019.

52.   Based on my review of loan documents provided by Lender A, I know that it approved Envisioning Future's PPP application and funded the loan.  According to records provided by Lender A and Financial Institution 1, on or about May 12, 2020, Lender A transferred via interstate wire approximately $1,267,140 in proceeds from the Envisioning Future PPP loan to

the Envisioning Future Account, for which ATTA was the sole signatory.  At the time the PPP loan proceeds were transferred, the Envisioning Future Account had approximately $10,500 on deposit.

53.  According to records provided by Financial Institution 1, the next day, on or about May 13, 2020, a cashier's check for approximately $1,277,000, which in substantial part was comprised of the Envisioning Future PPP loan proceeds, was purchased from funds drawn on the Envisioning Future Account.  According to records provided by Financial Institution 1, on or about May 13, 2020, the cashier's check was deposited into the CS-1 Account #1.

54.  Based on my review of emails from a loan officer at Lender A, I know that on or about November 18, 2020, ATTA contacted Lender A by email using his personal Gmail address, attamuh@gmail.com, to inquire about the forgiveness of the Envisioning Future PPP loan.

### Envisioning Future EIDL Loan

55.  Based on my review of information provided by the SBA, the SBA received an application in the name of Envisioning Future seeking an EIDL loan in the amount of $150,000.  The application was electronically submitted in the name of ATTA via the SBA's online portal.

56.   The SBA approved and funded the Envisioning Future EIDL loan, and on or about June 12, 2020, the SBA transferred via interstate wire approximately $149,900 in proceeds from the Envisioning Future EIDL loan to the Envisioning Future Account, for which ATTA is the sole signatory.  At the time the EIDL loan proceeds were transferred, the Envisioning Future Account had approximately $660 on deposit.

57.   According to records provided by Financial Institution 1, on or about June 22, 2020, approximately $150,360, which in substantial part was comprised of the Envisioning Future EIDL loan proceeds, was wired from the Envisioning Future Account to the American Auto Barn Account, for which ATTA is the sole signatory.  Based on my review of records from Financial Institution 1, the Envisioning Future EIDL loan proceeds were not used for expenses permitted under the EIDL loan program as described above in paragraphs 7(f)-7(j).

### Wermer Construction PPP Loan

58.   Based on my review of loan documents provided by Lender A, I know the following:

a.   On or about April 14, 2020, Lender A received a PPP application in the name of Wermer Construction Inc. ("Wermer Construction") seeking a PPP loan in the amount of $326,335.

b.    The application was electronically submitted through IP address, 104.34.50.159, in the name of ATTA, who described himself as the President and 100% owner of Wermer Construction.

c.    The PPP borrower application represented that Wermer Construction had 37 employees, including employees for whom it paid wages and payroll taxes, and that the purpose of the PPP loan was to cover payroll.

d.    The email associated with this PPP loan application was wermerconstruction@gmail.com.

59.  According to records supplied by Google, I know the following:

a.    The email address wermerconstruction@gmail.com has a listed "Recovery SMS number" of 19097499426 as well as a "Recovery e-mail" of attamuh@gmail.com.

60.  Based on my review of loan documents provided by Lender A, several documents were submitted in support of the Wermer Construction PPP loan application, including:

a.    IRS Employer's Quarterly Federal Tax Returns (IRS Form 941) for Wermer Construction for each quarter of 2019 and the first quarter of 2020; and

b.    Payroll data and documentation for Wermer Construction, including documents purporting to be payroll

registers for 2019 and the first quarter of 2020, purporting to show wages paid to its employees.

61.  Based on information from the IRS, I know that the IRS Forms 941 submitted with the Wermer Construction PPP loan were not filed with the IRS.  In fact, IRS records show that Wermer Construction had not filed quarterly federal income tax returns with the IRS for 2019 and the first quarter of 2020.

62.  Based on a review of the payroll data and documentation for Wermer Construction provided to Lender A, I know that the number of employees listed in that data and documentation did not match the number listed in the IRS Forms 941 that were submitted to Lender A.

63.  Based on my review of the Wermer Construction PPP loan application, I know that ATTA answered, "No" to the question:

> Has the Applicant, any owner of the Applicant, or any business owned or controlled by any of them, ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted in the last 7 years and caused a loss to the government?

Based on my review of SBA records and as discussed above, I know that ATTA is listed as a principal on a SBA loan for Moval Shopping Center LLC that was funded on January 5, 2016 and which, according to SBA records, has been delinquent since at least the beginning of 2019.

64.  Based on my review of loan documents provided by
Lender A, I know that it approved Wermer Construction's PPP
application and funded the loan.  According to records provided
by Lender A and Financial Institution 1, on or about May 13,
2020, Lender A transferred via interstate wire approximately
$326,335 in proceeds from the Wermer Construction PPP loan to
the Wermer Construction Account, for which ATTA was the sole
signatory.  At the time the PPP loan proceeds were transferred,
the Wermer Construction Account had approximately $14,772 on
deposit.

65.  According to records provided by Financial
Institution 1, five days later on or about May 18, 2020, a
cashier's check for approximately $340,000, which in substantial
part was comprised of the Wermer Construction PPP loan proceeds,
was purchased from funds drawn on the Wermer Construction
Account.  According to records provided by Financial
Institution 4, on or about May 18, 2020, the cashier's check was
deposited into the CS-1 Account #5.

### Wermer Construction EIDL Loan

66.  Based on my review of information provided by the SBA,
the SBA received an application in the name of Wermer
Construction seeking an EIDL loan in the amount of $150,000.
The application was electronically submitted in the name of M.P.
via the SBA's online portal.  As described above in paragraph

21, M.P. was incarcerated at the time the Wermer Construction EIDL loan application was submitted in his name.  Based on my training and experience, ATTA's repeated use of M.P.'s name and social security number in connection with this loan application (and others described above), supports the inference that ATTA knew M.P. was a real person whose credentials would pass scrutiny.

67.  Based on my review of the information provided to the SBA for the Wermer Construction EIDL loan and IRS records, I know that the EIN listed for Wermer Construction is registered to ATTA.

68.  The SBA approved and funded the Wermer Construction EIDL loan, and on or about July 2, 2020, the SBA transferred via interstate wire approximately $149,900 in proceeds from the Wermer Construction EIDL loan to the Wermer Construction Account, for which ATTA is the sole signatory.  At the time the EIDL loan proceeds were transferred, the Wermer Construction Account had approximately $1,863 on deposit.

**CKSB PPP Loan**

69.  Based on my review of loan documents provided by Lender A, I learned the following:

a.  On or about May 27, 2020, Lender A received a PPP application in the name of CKSB LLC d/b/a Socal Hand Car Washes ("CKSB") seeking a PPP loan in the amount of $1,020,229.

-33-

b.    The application was electronically submitted in the name of Z.B., who was described as the President and 100% owner of CKSB.[4]

c.    The PPP borrower application represented that CKSB had 127 employees, including employees for whom it paid wages and payroll taxes, and that the purpose of the PPP loan was to cover payroll.

d.    The email associated with this PPP loan application was eficpa009@gmail.com.

70.    According to records supplied by Google, I know the following:

a.    The email address eficpa009@gmail.com has a "Recovery e-mail" of libertyrv2009@gmail.com, which is also associated with the loan application for Liberty RV in the name of M.P., discussed above in paragraph 27.

b.    The common IP address, 104.34.50.159, was used to access ATTA's personal Gmail account attamuh@gmail.com as well as various other entity accounts discussed above including libertyrv2009@gmail.com, americanautobarn@gmail.com, fontanack2015@gmail.com, and wermerconstruction@gmail.com.

---

[4] Based on my review of records from the California Secretary of State, I know that Z.B. is not listed as the President or owner of this entity.  In fact, the records do not reference Z.B. in any way.

c.   ATTA appears to know Z.B., based on travel itineraries for Z.B. and his/her spouse, appearing in ATTA's email messages along with communications with H.B. regarding Z.B.'s health, real estate transactions, and other unrelated personal matters.

71.  Based on my review of loan documents provided by Lender A, several documents were submitted in support of the CKSB PPP loan application, including:

a.   IRS Employer's Quarterly Federal Tax Returns (IRS Form 941) for CKSB for each quarter of 2019 and the first quarter of 2020; and

b.   Payroll data and documentation for CKSB, including documents purporting to be payroll registers for 2019 and the first quarter of 2020, purporting to show wages paid to its employees.

72.  Based on information from the IRS, I know that the IRS Forms 941 submitted with the CKSB PPP loan were not filed with the IRS.  In fact, IRS records show that CKSB had not filed quarterly federal income tax returns with the IRS for 2019 and the first quarter of 2020.  In addition, IRS records show that CKSB's EIN is registered to ATTA.

73.  Based on a review of the payroll data and documentation for CKSB provided to Lender A, I know that the number of employees listed in that data and documentation did

-35-

not match the number listed in the IRS Forms 941 that were submitted to Lender A.

74.   Based on my review of loan documents provided by Lender A, I know that it approved CKSB's PPP application and funded the loan.  According to records provided by Lender A and Financial Institution 1, on or about June 3, 2020, Lender A transferred via interstate wire approximately $1,020,230 in proceeds from the CKSB PPP loan to the CKSB Account, for which ATTA was the sole signatory.  At the time the PPP loan proceeds were transferred, the CKSB Account had approximately $1,093 on deposit.

75.   According to records provided by Financial Institution 1, five days later on or about June 8, 2020, a cashier's check for approximately $821,000, which in substantial part was comprised of the CKSB PPP loan proceeds, was purchased from funds drawn on the CKSB Account.  According to records provided by Financial Institution 2, on or about June 8, 2020, the cashier's check was deposited into the CS-1 Account #3.

76.   According to records provided by Financial Institution 1, also on or about June 8, 2020, approximately $200,000, which in substantial part was comprised of the CKSB PPP loan proceeds, was wired from the CKSB Account to the American Auto Barn Account.

## Camel and Camel PPP Loan

77.   Based on my review of loan documents provided by Lender A, I know the following:

a.   On or about May 28, 2020, Lender A received a PPP application in the name of Camel and Camel Inc. d/b/a Mobile Fleet Maintenance ("Camel and Camel") seeking a PPP loan in the amount of $859,790.

b.   The application was electronically submitted, through the IP address 107.181.166.101 (discussed below in paragraph 78), in the name of S.B., who was described as the President and 100% owner of Camel and Camel.[5]

c.    The PPP borrower application represented that Camel and Camel had 92 employees, including employees for whom it paid wages and payroll taxes, and that the purpose of the PPP loan was to cover payroll, lease/mortgage interest, and utilities.

d.   The email associated with this PPP loan application was greenwise2019@gmail.com.

78.   According to records supplied by Google, I know the following:

---

[5] Based on my review of records received from the California Secretary of State, I know that ATTA is listed as the President of this entity.

a.   The email address greenwise2019@gmail.com is connected to ATTA based on the "Recovery SMS number" of 19097499426 and "Recovery e-mail" of attamuh@gmail.com.

b.   The email greenwise2019@gmail.com was accessed through IP address, 107.181.166.101, which was also used to access eficpa009@gmail.com (i.e., the email account associated with the loan application for CKSB LLC submitted in the name of Z.B. as discussed in paragraph 69 above).

c.   ATTA appears to know S.B. based on travel itineraries for S.B. and his/her spouse Z.B., appearing in ATTA's email messages along with communications with H.B. regarding Z.B.'s health and other unrelated personal matters.

79.  Based on my review of loan documents provided by Lender A, several documents were submitted in support of the Camel and Camel PPP loan application, including:

a.   IRS Employer's Quarterly Federal Tax Returns (IRS Form 941) for Camel and Camel for each quarter of 2019 and the first quarter of 2020; and

b.   Payroll data and documentation for Camel and Camel, including documents purporting to be payroll registers for 2019 and the first quarter of 2020, purporting to show wages paid to its employees.

80.  Based on information from the IRS, I know that the IRS Forms 941 submitted with the Camel and Camel PPP loan were not

filed with the IRS.  In fact, IRS records show that Camel and Camel had not filed quarterly federal income tax returns with the IRS for 2019 and the first quarter of 2020.  In addition, IRS records show that Camel and Camel's EIN is registered to ATTA.

81.  Based on a review of the payroll data and documentation for Camel and Camel provided to Lender A, I know that the number of employees listed in that data and documentation did not match the number listed in the IRS Forms 941 that were submitted to Lender A.

82.  Based on my review of loan documents provided by Lender A, I know that it approved Camel and Camel's PPP application and funded the loan.  According to records provided by Lender A and Financial Institution 1, on or about June 3, 2020, Lender A transferred via interstate wire approximately $859,790 in proceeds from the Camel and Camel PPP loan to the Camel and Camel Account, for which ATTA was the sole signatory. At the time the PPP loan proceeds were transferred, the Camel and Camel Account had approximately $100 on deposit.

83.  According to records provided by Financial Institution 1, five days later on or about June 8, 2020, a cashier's check for approximately $850,000, which in substantial part was comprised of the Camel and Camel PPP loan proceeds, was purchased from funds drawn on the Camel and Camel Account.

According to records provided by Financial Institution 5, on or about June 8, 2020, the cashier's check was deposited into CS-1 Account #6.

## PPP and EIDL Funds Wired to Pakistan

84.  According to records provided by Financial Institution 1, on or about June 22, 2020, CS-1 caused approximately $1,376,627 (which in substantial part was comprised of the $1,267,140 in Envisioning Future PPP loan proceeds discussed in paragraph 52 above) to be wired from the CS-1 Account #1 to an account at Financial Institution 6 in the name of Individuals 2 and 3 with an address in Islamabad, Pakistan.  The wire transfer details included a note that the wire was "family support."

85.  According to records provided by Financial Institutions 1 and 2, on or about June 22, 2020, CS-1 caused approximately $850,000 (which in substantial part was comprised of the $1,020,230 in CKSB PPP loan proceeds discussed in paragraph 74 above, of which $821,000 was deposited in CS-1 Account #3 as discussed in paragraph 75 above) to be wired from CS-1 Account #3 to an account at Financial Institution 6 in the name of Individuals 2 and 3 with an address in Islamabad, Pakistan.  The wire transfer details included a note that the wire was "FAMILY SUPPORT."

86.  According to records provided by Financial Institution 1, on or about June 24, 2020, CS-1 caused approximately $840,000 (which in substantial part was comprised of the $859,790 in Camel and Camel PPP loan proceeds discussed in paragraph 82 above) to be wired from CS-1 Account #2 to an account at Financial Institution 6 in the name of Individuals 2 and 3 with an address in Islamabad, Pakistan.  The wire transfer details included a note that the wire was "family support."

87.  According to records provided by Financial Institutions 1 and 3, on or about June 26, 2020, CS-1 caused approximately $1,900,000 (which in substantial part was comprised of the $1,908,595 in Fontana CK PPP loan proceeds discussed in paragraph 25 above) to be wired from CS-1 Account #4 to an account at Financial Institution 6 in the name of Individuals 2 and 3 with an address in Islamabad, Pakistan.  The wire transfer details included a note that the wire was "FAMILY SUPPORT PROPERTY PURCHASE."

88.  According to records provided by Financial Institutions 1 and 4, on or about June 26, 2020, a cashier's check for approximately $1,284,000 (which in part was comprised of the $326,335 in Wermer Construction PPP loan proceeds discussed in paragraph 64 above) was purchased from funds drawn on CS-1 Account #5 and deposited in CS-1 Account #2.  According to records provided by Financial Institutions 1, on or about

July 3, 2020, CS-1 caused approximately $1,700,000 (which in part was comprised of the $326,335 in Wermer Construction PPP loan proceeds discussed in paragraph 64 above) to be wired from CS-1 Account #2 to an account at Financial Institution 6 in the name of Individuals 2 and 3 with an address in Islamabad, Pakistan.  The wire transfer details included a note that the wire was "family support."

### Foreign Travel

89.  Based on my review of border crossing information, I know the following:

a.    ATTA has a history of foreign travel, including a recent trip to Dubai[6] in June 2020, from which ATTA has yet to return to the United States.

b.    ATTA also took two trips abroad in 2019, including a two-week trip to Abu Dhabi in August 2019 and a two-week trip to Dubai in January 2019.

c.    ATTA also travelled to Dubai in the Fall of 2018 and stayed nearly one month.

d.    ATTA's wife also has a history of foreign travel in 2020, including a flight from the United States to Paris, France in July 2020 and a return flight to the United States

---

[6] As noted in paragraph 8 above, Financial Institution 6 is a wholly owned subsidiary of an Islamic bank headquartered in Dubai, United Arab Emirates.

from Paris, France in October 2020.  Later in October 2020, she took an outbound flight from the United States to Amsterdam (with her ultimate destination unknown) and has not returned to the United States.

      e.  CS-1 likewise has history of foreign travel, including one recent trip to Paris, France this year.  CS-1 also appears to have travelled to Abu Dhabi and Dubai during the same time periods as ATTA in or around January 2019 and in or around August 2019.

\* \* \* \*

    90.  Based on the above information, there is probable cause to believe that:

[18 U.S.C. § 1343]

      a.  Beginning in or around April 2020 and continuing until at least in or around July 2020, in Los Angeles County, within the Central District of California, and elsewhere, ATTA, together with others known and unknown, knowingly and with intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud Lender A and the SBA, and United States taxpayers as to material matters, and to obtain moneys, funds, assets, and other property owned by and in the custody and control of the Lender A and the SBA by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

-43-

b.    For the purpose of executing the above-described scheme to defraud, ATTA, transmitted and caused the transmission of the following by means of wire and radio communication in interstate and foreign commerce:  a transfer of approximately $1,908,595 in PPP loan proceeds from Lender A, sent by means of an interstate wire, into the Fontana CK Account on or about June 4, 2020.

[18 U.S.C. § 1028A]

c.    Beginning no later than in or around April 2020 and continuing until at least in or around July 2020, in Los Angeles County, within the Central District of California, and elsewhere, ATTA, together with others known and unknown, knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that ATTA knew belonged to another person, namely, the name and social security number of M.P., during and in relation to wire fraud, a felony violation of Title 18, United States Code, Section 1343.

[18 U.S.C. § 1956(h)]

d.    Beginning in or around April 2020 and continuing through at least in or around July 2020, in Los Angeles and Riverside Counties, within the Central District of California, and elsewhere, ATTA and CS-1, together with co-conspirators

known and unknown, knowingly combined, conspired, and agreed to commit the following offenses against the United States:

        i.    Transactional Money Laundering, in violation of Title 18, United States Code, Section 1957, by engaging in and willfully causing others to engage in monetary transactions, in and affecting interstate commerce, in criminally derived property of a value greater than $10,000, which property, in fact, was derived from specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1343; and

        ii.    International Concealment Money Laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i), by knowingly transporting, transmitting, and transferring and causing to be transported, transmitted, and transferred, monetary instruments and funds from a place in the United States to and through a place outside of the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, ownership, and control of the proceeds of specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1343.

e.    The objects of the conspiracy were carried out, and to be carried out, in substance as follows:  ATTA would apply for Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan Program ("EIDL") loans in his name, the name of coconspirators, and in the name of stolen identity, M.P. ATTA would submit false and fictitious documents in support of the PPP and EIDL loan applications.  ATTA would then direct that the PPP and EIDL loan proceeds be deposited into bank accounts that ATTA controlled.  ATTA would transfer PPP and EIDL loan proceeds to accounts controlled by CS-1 by means of wire transfer or cashier's check.  CS-1 would then wire the PPP and EIDL loan proceeds to coconspirators in Pakistan.  ATTA, CS-1, and their coconspirators, would use the fraudulently obtained PPP and EIDL loan proceeds for their own personal benefit, including for expenses prohibited under the requirements of the PPP and EIDL programs.

//

//

## CONCLUSION

91.  For the all the reasons described above, there is probable cause to believe that ATTA violated violation of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1028A(a)(1) (Aggravated Identity Theft), 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering.

Attested to by the applicant in
Accordance with the requirements
Of Fed. R. Crim. P. 4.1 by
Telephone on this 18th day of
December, 2020

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE